**HEALTH CARE PLAN OF NEW JERSEY, INC., Plaintiff,**

v.

**Richard S. SCHWEIKER, Secretary, United States Department of Health and Human Services; Joanne E. Finley, Commissioner, New Jersey Department of Health; New Jersey Hospital Rate Setting Commission, Defendants.**

Civ. A. No. 81-1887.

United States District Court,
D. New Jersey.

Feb. 8, 1982.

Robert F. Blomquist, Davis & Reberkenny, Cherry Hill, N.J., for plaintiff.

W. Hunt Dumont, U.S. Atty. by Stephen Taylor, Asst. U.S. Atty., Newark, N.J., for defendant Richard S. Schweiker.

Irwin Kimmelman, Atty. Gen. by Charlotte Kitler, Deputy Atty. Gen., Dept. of

Law and Public Safety, Div. of Law Labor, Industry and Health Section, Trenton, N.J., for defendants Joanne E. Finley and New Jersey Hosp. Rate Setting Comn.

## FINDINGS OF FACT and
## CONCLUSIONS OF LAW

BROTMAN, District Judge.

This is an action in which plaintiff Health Care Plan of New Jersey, Inc., (hereinafter, "HCP") questions the constitutionality of the application to it of regulations propounded by the New Jersey Department of Health. HCP seeks to enjoin the defendants from continuing to enforce against HCP a state regulatory system which sets reimbursement rates for hospital services. The system is known as the "Diagnostically Related Group Prospective Case-Mix Hospital Reimbursement Regulatory System" (hereinafter, "the DRG system" or "the DRG plan"). The regulations implementing the DRG system are found at N.J.A.C. 8:31B–1, et seq. HCP claims that the DRG system is invalid as it pertains to hospital rates payable to HCP on the ground that it conflicts with the federal Health Maintenance Organization Act of 1973, as amended, 42 U.S.C. sections 300e through 300e–14, and the National Health Planning Resources and Development Act, 42 U.S.C. sections 300k through 300t, and that the system thereby violates the Supremacy Clause. U.S. Const., Art. VI, sec. 2. Plaintiff also alleges that the application of the DRG system violates HCP's constitutional rights as guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as HCP's rights under the Contract Clause. U.S. Const., Amend. XIV and Art. I, sec. 10. This court has jurisdiction under 28 U.S.C. section 1331.

Plaintiff seeks declaratory and injunctive relief against the defendants Finley, the New Jersey Department of Health, and the New Jersey Hospital Rate Setting Commission. Plaintiff also seeks to enjoin defendant Schweiker from his alleged failure to prevent the operation of the DRG system insofar as it impairs HCP's ability to meet its obligations under the Health Maintenance Organization Act, supra, and insofar as it interferes with any federal programs which are designed to promote the financial success of HCP and other health maintenance organizations.

A two day hearing on plaintiff's application for preliminary injunctive relief was held. Following that, additional evidence was submitted and plaintiff's motion for consolidation of the trial on the merits with the first hearing was granted. Fed.R. Civ.P., Rule 65(a)(2). Accordingly, the court hereby enters these findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Health Care Plan of New Jersey, Inc., is a non-profit corporation organized and operating as a health maintenance organization under the New Jersey Health Maintenance Organizations Act. L.1973, c. 337; N.J.S.A. 26:2J–1, et seq.

2. Defendant Richard S. Schweiker, Secretary of the Department of Health and Human Services, is responsible for administering portions of the Health Maintenance Organization Act of 1973, as amended, 42 U.S.C. sections 300e through 300e–14, and the National Health Planning Resources and Development Act of 1974. 42 U.S.C. sections 300k through 300t.

3. Defendants Joanne E. Finley, Commissioner of Health, the New Jersey Department of Health, and the New Jersey Hospital Rate Setting Commission, are state officials or agencies of New Jersey in charge of administering the DRG system under the authority of L.1971, c. 136, sec. 18; N.J.S.A. 26:2H–18; as amended, L.1978, c. 83, sec. 10, and under the authority of N.J.A.C. 8:31B–1, et seq.

4(a). There are nine health maintenance organizations (hereinafter "HMOs") operating in the state of New Jersey under the provision of New Jersey's Health Maintenance Organizations Act, supra. Some of these HMOs, including HCP, are "federally qualified HMOs" within the meaning of 42 U.S.C. sections 300e(a) and 300e–5. (Plain-

tiff's Ex. 1, pp. 3–4.) Federal qualification allows an HMO to receive federal grants, loans, loan guarantees and contracts designed to defray the costs of feasibility surveys, 42 U.S.C. section 300e–2 planning and development, 42 U.S.C. section 300e–3, and initial operations. 42 U.S.C. sec. 300e–4. 4(b). Before becoming federally qualified, an HMO must satisfy the Secretary of Health and Human Services that there exist or are anticipated adequate sources of revenue to support the services to be provided by the HMO. 42 U.S.C. section 300e–5(b)(3)(G). The HMO must also show that there exist or are anticipated adequate "financial arrangements and capabilities" of the HMO. 42 U.S.C. section 300e–5(b)(3)(I). In order to become federally qualified, an HMO is required to provide a number of "basic health services," including "inpatient and outpatient hospital services." 42 U.S.C. section 300e–1(1)(B).

5. On June 1, 1976, HCP became a federally qualified HMO. (Cert. of C. Frederick Berger, para. 5). Since that date, HCP has received $1,605,557.00 in grants and $3,154,000.00 in loans from the Department of Health and Human Services. (Vol. 2, pp. 4–6). HCP is in debt to the federal government in the amount of approximately three million dollars. (Vol. 2, p. 6)

6. HCP became ineligible for additional federal loans in May, 1981, because an HMO may only be assisted during the first sixty months following its federal qualification. (Vol. 1, pp. 79–80; vol. 2, p. 6). 42 U.S.C. section 300e–4(a)(1).

7. Prior to the implementation of the DRG system, HCP had negotiated contracts with three hospitals whereby it paid the hospitals a *per diem* rate for services rendered by the hospitals for the care of HCP's subscribers. The three affiliated hospitals are Burlington County Hospital, Cooper Medical Center and Our Lady of Lourdes Hospital. From October, 1980, to May, 1981, 54 per cent of the days spent by HCP subscribers in hospitals were in Burlington County Hospital, 31 per cent in Cooper Medical Center, 5 per cent in Our Lady of Lourdes Hospital, and the rest in non-contracting hospitals. (Vol. 1, pp. 21, 30, 54)

8a. In 1978, the New Jersey Legislature passed L.1978, c. 83, amending the Health Care Facilities Planning Act, N.J.S.A. 26:2H–1, *et seq.*, and providing for the establishment of a comprehensive system of regulatory control over hospital rates. One of the purposes of this law was to redress the financial plight of inner-city hospitals which had incurred large costs caring for indigent patients. To that end the statute expressly provided for the inclusion of certain financial elements in the hospital rate structure which had not been recognized under the previous rate review system. These elements included indigency care costs, bad debts and working capital needs. N.J.S.A. 26:2H–18(d). Another purpose of the law was to permit effective limitation of hospital costs. (Vol. 2, pp. 71–72)

8b. The 1978 New Jersey statute provides that all payment rates "shall be equitable for each payor or class of payors without discrimination or individual preference...." The statute permits the Hospital Rate Setting Commission to grant differentials in the payment rates to a payor or class of payors for "quantifiable economic benefits rendered to the institution or to the health care delivery system taken as a whole." N.J.S.A. 26:2H–18(b).

9. The New Jersey Department of Health propounded N.J.A.C. 8:31B–1, *et seq.*, which implements the 1978 statute and which embodies the DRG system. This system establishes 383 Diagnosis Related Groupings, representing medical classifications of illnesses for which hospital patients are treated. Development of the DRG system was funded by a federal grant from the Social Security Administration. (Vol. 2, pp. 73–75) The federal government has been paying DRG rates to New Jersey health care providers for treatment of patients under the Medicare program, pursuant to a waiver of standard Medicare reimbursement principles. (Vol. 2, p. 85) 42 U.S.C. section 1395b–1(b).

10. Normally, a hospital under the DRG system is required to bill in accordance with the nature of the patient's illness. Each

patient is assigned to one of the 383 Diagnostic Related Groupings through the use of medically accepted techniques of diagnosis. The DRG system establishes upper and lower "trim points"—expressed as numbers of days—for each illness. These trim points represent normative bounds within which a patient assigned to a particular one of the 383 illnesses may be expected to remain in the hospital. If a patient remains in the hospital beyond the upper trim points, the hospital may bill for actual services rendered. Likewise, if a patient leaves before the period expressed by the lower trim point begins, the patient is charged for actual services. In most cases, however, the diagnosis assigned to a patient establishes the amount which may be paid to the hospital.

11. The application of the DRG system is being carried out over a period of years. Burlington County Hospital began to be governed by the DRG system in May, 1981. (Vol. 1, p. 22)

12. Physicians on the staff of HCP make efforts to keep HCP subscribers out of hospitals by delivery of preventive health care and education. (Vol. 1, p. 22)

13. Pre-admission testing is done by HCP personnel outside of hospitals. (Vol. 1, p. 22)

14. Efforts are made by HCP physicians to have subscribers who are in hospitals discharged therefrom as early as possible. (Vol. 1, p. 23)

15. HCP's main source of income is from subscriber premiums, which are established annually by contract between HCP and each subscriber. These premiums cannot be changed more often than once each year. (Vol. 1, pp. 24–25)

16. The imposition of the DRG system results in duplication of pre-admission testing where such testing results in a decision to hospitalize. Hospitals are required to engage in extensive testing in order to complete a diagnosis. To this extent, the DRG system makes pre-admission testing outside of hospitals wasteful and duplicative of testing performed at hospitals. (Vol. 2, pp.

38–39, 85) Pre-admission testing does, however, produce benefits for HCP in that it reduces the number of hospital stays for its subscribers, thus reducing HCP's expenses (Vol. 1, p. 31) and gives HCP the ability to verify or to dispute diagnoses made by hospitals, which form the bases for the hospitals' billing of HCP. (Vol. 1, pp. 45, 66)

17. The DRG system reduces fiscal incentives for HCP physicians to influence hospitals to discharge HCP subscribers as rapidly as possible once the subscribers in question have stayed in the hospital beyond the time established by the lower trim points of the illnesses assigned to the patients. (Vol. 1, p. 27) The DRG system does, however, provide an inducement for a hospital to reduce each patient's length of stay. (Vol. 2, pp. 63–64; Vol. 2, p. 87) Further, every physician has an ethical obligation to attempt to reduce each patient's length of stay. (Vol. 1, p. 32)

18. The imposition of the DRG system has caused HCP to pay more to Burlington County Hospital than it would have paid under its *per diem* contract. (Vol. 1, pp. 70–77) Plaintiff expected its hospital costs to rise 20% as a result of the DRG system, and this expectation was reflected in rates charged to subscribers beginning in January, 1981. (Vol. 1, pp. 102–105) Hospital costs to HCP rose at an annual rate of 30% during the first month of the DRG system at Burlington County Hospital, (Vol. 1, p. 75) and continued to rise at approximately the same rate during the second month. (Docket Entry # 11) As a result of this misforecast of the amount that costs to HCP would rise due to the imposition of the DRG system, HCP has suffered financial reverses. (Vol. 1, pp. 92–96)

19. The assignment of a Diagnostic Related Grouping to each patient is subject to some degree of manipulation, and a hospital has an incentive to assign to each patient an illness which will result in the greatest amount of revenue for the hospital. (Vol. 1, pp. 65–66; Vol. 2, pp. 84–85, 123–24) Much of this manipulation would, however, be illegal, fraudulent and unethical. (Vol.

2, pp. 34–35)  Any such manipulation may be monitored when patients have undergone pre-admission testing. (See para. 16, *ante*)

20.  In April, 1980, the Secretary of Health and Human Services determined that HCP was not meeting the fiscal requirements to allow it to remain a federally qualified HMO.  In order to remedy this, HCP was required to make efforts to negotiate *per diem* contracts with three hospitals and to make efforts to see that as many of HCP's subscribers as possible were treated under these contracts when hospitalization was required.  HCP later became a fiscally sound operation within the meaning of the Health Maintenance Organization Act of 1973, and began to repay its loans to the federal government.  HCP sought to be declared in compliance with federal directives in February, 1981, but has not been declared in compliance.  HCP has been told informally that it would not be declared in compliance because of the financial reverses it has suffered since the imposition of the DRG system.  (Plaintiff's Exhibit 4, and exhibits attached thereto;  Volume 1, pp. 79–81: Vol. 2, pp. 7–15).  Failure to be declared in compliance with the Secretary's directives has itself compounded the financial difficulties faced by HCP, in part because, without compliance, HCP loses statutory right to have membership in HCP offered to employees of many large private and public employers.  42 U.S.C. section 300e–11(b)(1).

21.  Plaintiff has applied to the Hospital Rate Setting Commission for permission to pay a lower rate than other payors, but has failed to satisfy the Commission that it is entitled to the relief it seeks.  Except for showing that HCP subscribers require fewer hospital services during a maternity stay than other patients, HCP failed to show that its subscribers required fewer hospital services during their stays than did other patients for any other Diagnostic Related Grouping.  (State Defendants' Exhibit 2)

## CONCLUSIONS OF LAW

■  Plaintiff argues that the application of the DRG plan to it is preempted by federal law because the plan interferes with HCP's ability to operate effectively as an HMO.  Our starting point must be 42 U.S.C. section 300e–10, which is an enumeration of certain kinds of state laws which are rendered inoperative as against HMOs.  This section, as amended in 1976, also sets forth certain duties of the Secretary of Health and Human Services which must be carried out with an eye towards preventing the enforcement of such state laws against HMOs.  The section in its entirety reads as follows:

(a) In the case of any entity—

(1) which cannot do business as a health maintenance organization in a State in which it proposes to furnish basic and supplemental health services because that State by law, regulation, or otherwise—

(A) requires as a condition to doing business in that State that a medical society approve the furnishing of services by the entity,

(B) requires that physicians constitute all or a percentage of its governing body,

(C) requires that all physicians or a percentage of physicians in the locale participate or be permitted to participate in the provision of services for the entity, or

(D) requires that the entity meet requirements for insurers of health care services doing business in that State respecting initial capitalization and establishment of financial reserves against insolvency, and

(2) for which a grant, contract, loan or loan guarantee was made under this subchapter or which is a qualified health maintenance organization for purposes of section 300e–9 of this title (relating to employees' health benefits plans), such requirements shall not apply to that entity so as to prevent it from operating as a health maintenance organization in accordance with section 300e of this title.

(b) No State may establish or enforce any law which prevents a health maintenance organization for which a grant,

contract, loan, or loan guarantee was made under this subchapter or which is a qualified health maintenance organization for purposes of section 300e–9 of this title (relating to employees' health benefits plans), from soliciting members through advertising its services, charges, or other nonprofessional aspects of its operation. This subsection does not authorize any advertising which identifies, refers to, or makes any qualitative judgment concerning, any health professional who provides services for a health maintenance organization.

(c) The Secretary shall, within 6 months after October 8, 1976, develop a digest of State laws, regulations, and practices pertaining to development, establishment, and operation of health maintenance organizations which shall be updated at least quarterly and relevant sections of which shall be provided to the Governor of each State annually. Such digest shall indicate which State laws, regulations, and practices appear to be inconsistent with the operation of this section. The Secretary shall also insure that appropriate legal consultative assistance is available to the States for the purpose of complying with the provisions of this section.

It is clear that section 300e–10 enumerates five types of traditional regulations of which Congress took notice, and which it decided would be unduly restrictive on HMOs. Indeed, regulations which fall within these categories have previously been applied to prevent the development of HMOs and other types of group practice. [1973] 2 U.S.C.Cong. & Ad.News pp. 3033, 3057–58. Had a system like the DRG plan been in operation prior to the enactment of the HMO Act, and had the DRG system's impediments to the effective operation of HMOs been brought to the attention of Congress, the court would be able to say that the failure of Congress to include systems such as the one under consideration within section 300e–10 would be dispositive of plaintiff's preemption claim. *See DeVeau v. Braisted,* 363 U.S. 144, 151, 153–54, 80 S.Ct. 1146, 1151, 4 L.Ed.2d 1109 (1960).

Neither the DRG plan, however, nor any system of regulation similar to it has been before Congress, and it is for this reason that the court's inquiry can not end with section 300e–10. Its list is not exhaustive,* for the court is required to make an empirical inquiry into the operation of the DRG plan, in order to determine whether it has interfered with the effective operation of a federal program. This method of inquiry, advocated by plaintiff in this action, was employed by the Supreme Court in *Nash v. Florida Industrial Commission,* 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967), and in *City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). *See also Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

Where preemption is the issue, "each case turns on the peculiarities and features of the federal regulatory scheme in question."

---

* Of course, this court is required to read a statute of this nature in a manner which allows the objective of the program it creates to be achieved, and in a way which comports with the rapidly changing circumstances of the medical market. Jerome Frank, *Words and Music: Some Remarks on Statutory Interpretation,* 47 Colum.L.Rev. 1259 (1947). In another era, Justice Holmes stated:

> We recognize that courts have been disinclined to extend statutes modifying the common law beyond the direct operation of the words used, and that at times this disinclination has been carried very far. But it seems to us that there may be statutes that need a different treatment. A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific case most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it and therefore we shall go on as before.

*Johnson v. United States,* 89 CCA 508, 163 F. 30, 32 (1908).

*City of Burbank v. Lockheed Air Terminal, supra,* 411 U.S. at 638, 93 S.Ct. at 1862, citing *Hines v. Davidowitz, supra,* and *Portland Cement Co. v. Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). It has already been explained, *ante,* that Congress has established a category of federally qualified HMOs, of which HCP is one. As such, HCP is availed of certain provisions of federal law which enable it to market its services in the form of employee benefit plans. It cannot be doubted that Congress determined that the profusion and maintenance of federally qualified HMOs would enhance the nation's opportunities for decent health care at a reasonable price.

Further, federal qualification makes an HMO a recipient of large amounts of federal monetary aid, most of which is in the form of loans and loan guarantees. The court assumes that it was intended that these loans were granted with the expectation of repayment, and that state laws which are a direct impediment to repayment act to frustrate Congressional goals.

These two factors—the grant of the imprimatur of federal qualification and the giving of monies—do not state the full measure of federal involvement with HCP. Plaintiff had made a commitment to the Secretary whereby it promised that it would enter into *per diem* contracts with its affiliated hospitals, and that it would make an effort to use those hospitals as much as possible. It was thought that these *per diem* contracts would increase the ability of plaintiff to repay its loans and to provide services to its subscribers.

It is on this mandate to enter into *per diem* contracts that plaintiff's preemption argument turns, for the DRG system makes such contracts illegal. It has not been shown, however, that *per diem* contracts are an essential prerequisite to HCP's profitability. Profitability and the provision of services to subscribers are the two keys to federal qualification; the *per diem* method of contracting for those services is the

means to those ends, but is not itself the goal of the federal program. The court finds that better financial planning would have prevented HCP's present financial straits, and it is inferred that it is HCP's current deficit which prevents it from being declared in compliance, rather than the illegality *per se* of *per diem* contracts.

Plaintiff contends that the existence of *per diem* contracts has been the reason why HCP has kept its costs down and the reason why the public would be induced to enroll as members of HCP. The *per diem* contracts, also, had given HMOs like HCP a competitive advantage over more traditional sources of medical care, because they had given HCP physicians a financial inducement to reduce the amount of time spent in hospitals by HCP subscribers. Under the DRG system, the advantage derived from the shortening of hospital stays shifts to the hospitals themselves, along with the inducement to do so. Nevertheless it cannot be said that HCP has thereby lost its entire competitive advantage. By the use of pre-hospitalization testing and by emphasis on preventive care, HMOs remain in a unique position to minimize the costs to its subscribers. Moreover, there is no basis for the assertion that Congress intended to give HMOs a competitive advantage in the medical marketplace. The act dealing with HMOs contains several provisions which set HMOs on an equal footing with other medical care suppliers, *see,* 42 U.S.C. section 300e–10, 300e–11, but there is no provision which is aimed at guaranteeing that they will forever thrive in the competitive marketplace. The Supreme Court has repeatedly stated that state regulation is not to be displaced by a federal program unless "Congress has unmistakably so ordained." *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981). Because Congressional intent to preempt state laws is not to be lightly inferred, *e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 248 (1973), the court declines to give the expansive reading to the federal statutes which the plaintiff advocates.

Plaintiff further relies on the National Health Planning & Resources Development Act of 1974, 42 U.S.C. sections 300k through 300t, as an additional source of federal preemption. Plaintiff points especially to 42 U.S.C. section 300k–2, which sets forth a Congressional finding as to seventeen factors which "deserve priority consideration in the formulation of national health planning goals and in the development and operation of federal, State, and area health planning and resource development programs." 42 U.S.C. section 300k–2(a). A number of these factors are pertinent to HCP, including the third of the list of seventeen, which specifically mentions HMOs. Plaintiff has not explained why this list gives it standing to call for the invalidation of the DRG system or of any state law. Nor has plaintiff explained why it is entitled to relief under 42 U.S.C. section 300n–1(c). This subsection, along with 42 U.S.C. section 300n–1(a), deals with factors to be considered when federal funds are given, 42 U.S.C. section 300l–2(e), (g), (referred to in 42 U.S.C. section 300n–1(a)) and when states consult with the federal government. 42 U.S.C. sections 300l–2(f), 300m–1. If these statutes provide grounds for preventing the use of federal funds in certain cases, it is enough to say that plaintiff has not sought this form of relief. The provisions appear to create no warrant for invalidation of state law.

For these reasons, the court concludes that the DRG plan is not preempted by federal law. Consequently, the Secretary may not be enjoined to declare that the DRG system is invalid within the meaning of 42 U.S.C. section 300e–10(c). Further, plaintiff has stated in its brief that it wishes to have this court order the Secretary to declare that HCP is in compliance with the provisions of the HMO Act. The court must decline to do so because HCP has not shown that it is in a financial position to repay its loans.

■ Plaintiff's arguments that the DRG system violates its rights under the Due Process clause are entirely insubstantial. Plaintiff does not show that any fundamental rights are impaired as a result of the DRG system, or that the interest which it here seeks to protect is anything other than its access to business income. In such a case, plaintiff is required to show that the DRG system is not rationally calculated toward the admittedly legitimate state goals of controlling and fairly distributing the burden of hospital costs. *E.g., Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978).

Plaintiff has not sustained its burden merely by showing that the DRG system is subject to manipulation by hospitals through the use of improper diagnostic techniques. Such manipulation is fraudulent and illegal, and the possibility that the legal requirements of a regulatory scheme may be circumvented is no grounds for invalidation of that scheme. If plaintiff's argument were to prevail, no law could be upheld once it were shown that the law had been broken. The fact that the trim points may be so low as to present little inducement to shorten hospital stays is also not enough to invalidate the DRG plan, for this low setting may be an inducement to minimize instances of hospitalization as much as to reduce the length of stays.

Plaintiff's equal protection argument appears to be based on the notion that it is different from other customers of hospitals, and that it should therefore be treated differently. Plaintiff has not pointed to any case where an argument of this nature has prevailed. The court believes that this argument properly falls within the rubric of due process, where the inquiry is whether the state's treatment of HCP is rationally related to its legitimate health and economic objectives. For the reasons stated above, the argument must be rejected.

■ As for plaintiff's claim under the contract clause, it is axiomatic that plaintiff's arrangements with its suppliers are subject to modification by the state's rational exercise of its police powers. *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

Plaintiff has presented no reason why this court should not defer to the appropriate state agency in determining whether the DRG system is or is not authorized by N.J.S.A. 26:2H-18. The court declines to declare the DRG system invalid under state law.

For these reasons, the court will enter judgment in favor of the defendants and against the plaintiff.