KAHN, Judge.
Appellants, in these four consolidated cases,[2] challenge circuit court orders granting summary judgment for reinsurers Provident Life and Accident Insurance Company (Provident) and State Mutual Life Assurance Company of America (State Mutual), denying the motions for summary judgment filed by health care providers and dismissing the second amended complaint of the Department of Insurance. The issue in all four cases is whether the circuit court erred in interpreting the term “unaffiliated provider” in health maintenance organization (HMO) insolvency endorsements as *507 providers without contracts. The State Mutual case also raises a second issue regarding the validity of its Endorsement No. 3 which defined the term “unaffiliated provider.” [3] The reinsurance agreements in the Provident cases do not have any endorsements defining the term “unaffiliated provider.”
This appeal is the result of the collapse of three separate HMOs. The three HMOs are International Medical Centers, Inc. (IMC), a Miami based HMO with about 175,000 members, many of whom are on medicare; Sunshine Health Plan, Inc. (Sunshine), an HMO operating in Brevard, Volu-sia and Flagler counties; and Suncoast Health Plan, Inc. (Suncoast), an HMO operating in Sarasota and Manatee counties. Appellee State Mutual Life Assurance Company of America (State Mutual) was the reinsurer of IMC and appellee Provident Life & Accident Insurance Company, Inc. (Provident) was the reinsurer of the other two HMOs. All three of the reinsurance agreements between the HMOs and the reinsurers included a provision requiring the reinsurer, in the event of the HMO’s insolvency, to provide payment to “unaffiliated providers.”[4]
*508 There is substantial dispute as to the definition of “unaffiliated provider.” Each of the HMOs utilized three classes of health care providers from whom HMO members could obtain health care. One group of providers had “affiliated provider contracts” which established procedures, practices and policies which the provider agreed to follow. The providers who had affiliated provider contracts were paid a capitated amount for providing primary health care services to the IMC members assigned to the affiliated provider’s clinic and were responsible for providing and *509 paying for all physician services including specialists from the monthly capitation payment. They thereby shared in the HMO’s profits or losses depending upon the costs of providing services to HMO members assigned to his or her clinic in relation to the capitation payment. The second class of providers had contracts with the HMO to furnish the necessary medical services at a pre-established rate but did not have “affiliated provider contracts” with the HMO. The third category of providers were those without any type of contract. HMO members used them in cases of emergency, when they were out of town or when they needed a specialist not within the HMO’s network.
After the HMOs became insolvent, the reinsurers contended that only the third class of provider, providers without contracts, were unaffiliated providers afforded protection under the reinsurance agreement. The Department and many of the providers asserted that all of the providers who did not have an “affiliated provider contract” with the HMO were protected under the insolvency endorsement.
On May 4, 1987, the Florida Department of Insurance instituted receivership proceedings against each of the three HMOs and was appointed receiver of each.[5] In those proceedings, the Department, on its own behalf, as a named additional rein-sured party under each of the three reinsurance agreements, and as a representative of a class consisting of certain hospitals and doctors that allegedly were “unaffiliated providers,” filed complaints against State Mutual and Provident. The Department’s claim against both reinsurers sought to require the reinsurers to pay “unaffiliated providers” under the respective reinsurance agreements. North Bre-vard County Hospital District d/b/a Jess Parrish Memorial Hospital (Jess Parrish) filed a separate lawsuit against Provident, as reinsurer of Sunshine and Suncoast, to collect proceeds of over $355,000 as an “unaffiliated provider.” The Sunshine, Suncoast and Jess Parrish proceedings were formally consolidated and heard together with the State Mutual proceedings. Wuesthoff Memorial Hospital, Inc. (Wues-thoff) intervened in the consolidated proceedings against Provident, claiming Provident owed it an amount in excess of $336,-000 based on its alleged status as an “unaffiliated provider.” Both Jess Parrish and Wuesthoff had service contracts with Sunshine. Neither hospital had entered an “affiliated provider contract.”
In the IMC receivership proceeding, State Mutual and the Department filed cross-motions for summary judgment on the meaning of the term “unaffiliated providers.” In the three consolidated cases, Jess Parrish moved for partial summary judgment based on its position on the meaning of the term “unaffiliated providers.” Provident, likewise, moved to dismiss the Department’s second amended complaint and filed a motion for summary judgment against Wuesthoff and Jess Parrish based on its position on the meaning of the term. The trial court granted State Mutual’s motion for partial summary judgment against the Department of Insurance and denied the Department’s cross-motion for partial summary judgment against State Mutual. The court also granted Provident’s amended motion for summary judgment against Wuesthoff and Jess Parrish, denied Jess Parrish’s motion for summary judgment against Provident, and dismissed the Department’s second amended complaint for declaratory judgment against Provident. We affirm the trial court’s orders for the reasons set out in this opinion.
The trial court properly interpreted the term “unaffiliated provider” as a provider without a contract based on the history of federal and state regulation of HMOs and the common usage of the term in the HMO industry.
*510 The terms of a statute must be given their plain meaning. See Powell v. State, 508 So.2d 1307, 1310 (Fla. 1st DCA 1987) (absent an explicit statement of legislative intent to the contrary, the words in a statute must be given their plain meaning), rev. denied, 518 So.2d 1277 (Fla.1987); National Fed. of Retired Persons v. Dep’t of Insurance, 553 So.2d 1289, 1290 (Fla. 1st DCA 1989) (plain meaning of a term can be ascertained by reference to a common dictionary definition). In the present case, however, the term “unaffiliated provider” is ambiguous.[6] In the context of HMO insolvency endorsements, the term “unaffiliated provider” can arguably be a provider who is not owned or controlled by the HMO, i.e., a provider who does not have an “affiliated provider contract,” or a provider who is not in any way associated with the HMO, i.e., a non-contract provider. Based on the ambiguity of the term, the court properly looked at the context in which section 641.285(5)(a), Florida Statutes, was written to determine the meaning of the term “unaffiliated provider.” See In re Order on Prosecution of Criminal Appeals by Tenth Judicial Circuit Public Defender, 561 So.2d 1130, 1137 (Fla.1990) (where language of statute is ambiguous, the court must look beyond the language of the statute to determine legislative intent); Ison v. Zimmerman, 372 So.2d 431 (Fla.1979); Deltona Corp. v. Florida Public Service Com’n, 220 So.2d 905 (Fla.1969) (the court may look to the legislative intent and purpose of the statute where plain meaning of statute is unclear).
At the time the term “unaffiliated provider” was used in section 641.285(5)(a), there was no other reference to “unaffiliated provider” in the Florida Statutes. The only other reference to “unaffiliated provider” was found in the federal regulations. The language in section 641.-285(5)(a), Florida Statutes, was taken almost verbatim from the 1975 federal regulation, 42 CFR § 110.108(a)(3)(1975).[7] The federal regulation required federally qualified HMOs to have a “plan for handling insolvency” including continuation of benefits for the duration of the contract period for which payment has been made, continuation of benefits to members who are confined on the date of insolvency in an inpatient facility until their discharge, and payment to ‘unaffiliated providers’ for services rendered.” 42 CFR § 110.108(a)(3) (1975). This was the first use of the industry phrase “unaffiliated providers” in any statute or regulation.
In 1980 the federal government issued “interpretive rulings” that were published in the Federal Register. The Notice published by the Department of Health, Education and Welfare (HEW) expressly provided that federal regulators would use the rulings in regulating HMOs. Among the rulings was the following definition of the term “unaffiliated providers”:
*511 For purposes of this section, an unaffiliated provider is a provider who is not (a) a member of the HMO’s staff or associated with its contracting medical group(s) or IPA(s); (b) a health professional under a direct services contract with the HMO; or (c) an entity, such as a hospital, with which an HMO has an arrangement for the provision of basic health service. 45 Fed.Reg. 28654 (Apr. 29, 1980).
Although this definition was never enacted in law, it is still accorded great weight. Charter Peachford Hasp., Inc. v. Bowen, 803 F.2d 1541, 1544 (11th Cir.1986) (“An agency’s interpretation of a regulation it has been authorized to promulgate is also entitled to great deference and must be upheld unless it is unreasonable, arbitrary and capricious or inconsistent with the statute”). The federal government two years later adopted 42 CFR § 110.108(a)(3)(b), which provided that one method by which an HMO could meet regulatory obligations was to have “[insolvency insurance, acceptable to the Secretary.” In order to be acceptable, such insurance was required to provide coverage for “unaffiliated providers.” The reference to “unaffiliated providers” was deleted in 1985 from 42 CFR § 110.108(a)(l)(iv), see supra note 4, expressly because it was duplicative of 42 CFR 110.108(a)(3)(B). The Federal Register on February 14, 1985 stated:
We proposed deleting the requirement for payments to unaffiliated providers because it is unnecessary in light of other regulatory provisions. Arrangements must be in place for payment to unaffiliated providers to meet pre-insolvency liabilities (§ 110.108(a)(3)), and services must be provided to members after insolvency through the period for which premiums have been paid, at no additional cost to members (see the first clause of § 110.108(a)(l)(iv)).
There were no objections to the proposal and it has been adopted.
50 Fed.Reg. 6172 (February 14, 1985).
In 1985, the Florida Legislature amended section 641.285(5)(a), Florida Statutes, to include a requirement for the same three classes of benefits provided in the 1975 code: (1) continuation of benefits for the duration of the contract period for which payment has been made, (2) continuation of benefits to members in an inpatient facility on the date of insolvency until their discharge, and (3) payments to unaffiliated providers for services rendered. This was the first and only use of the phrase “unaffiliated providers” in Florida law.[8] These three classes of benefits for which an insolvency plan was required, were adopted al *512 most verbatim from the 1975 federal regulation.
Although the Department contends that the federal government has withdrawn its requirement for coverage of claims of “unaffiliated providers” prior to the parties’ entry into the Reinsurance Agreement, the federal government still requires that insolvency endorsements include coverage for claims of “unaffiliated providers” and has not withdrawn the Federal Register definition. Under federal and various other state laws, health maintenance organizations are still required to provide insolvency protection for “unaffiliated providers” as defined in the federal register. 50 Fed. Reg. 6172 (Feb. 14, 1985); Mich.Com.Laws Ann. § 333.21002 (West Supp.1990); 31 Pa. Code § 301.2(c) (1990); Virginia Regulations of the Department of Insurance N.I.L.S. Reg. 28 at 294.2 (Sept. 1, 1987).
The federal government[9] now claims the federal definition, which they call an “informal” definition, does not preclude state regulators from adopting a different definition imposing stricter standards. We need not reach this contention since Florida regulators have never done so. The mandatory insolvency amendment required by the Department referenced the purview of the federal regulations and the Florida Statute in the same breath as it mandated a provision for payment of “unaffiliated providers.” Nothing in the Department’s pre-suit communications with the HMOs suggested that the term had two quite different meanings.
The Department and federal government assert that federal law should be disregarded because of the McCarran-Ferguson Act, 15 U.S.C. § 1011,[10] which leaves regulation of the “business of insurance” to the states unless federal laws specifically provide otherwise. The McCarran-Ferguson Act, however, has nothing to do with the regulation of HMOs. See O’Reilly v. Ceuleers, 912 F.2d 1383, 1389 (11th Cir.1990) (“when [Florida Statutes] Chapter 631 and 641 are applied to IMC, the [Florida] insurance commissioner is not ‘regulating the business of insurance’ ”). The federal government does regulate HMOs. Furthermore the Department’s chief HMO regulator himself referenced the federal rules in promulgating the insolvency insurance requirement.
The court properly relied on the federal provision to find the meaning of the term “unaffiliated provider.” See Gay v. Inter-County Telephone & Telegraph Co., 60 So.2d 22, 23 (Fla.1952) (Florida statutes patterned on federal law should be given the same construction as the federal law). *513 In its order granting State Mutual’s motion for partial summary judgment, the court held:
There is no basis for any assertion that the term ‘unaffiliated providers’ was intended to have, or did have, any different meaning under the Florida Statute than under the federal regulation on which it was patterned.
The meaning of the phrase ‘unaffiliated providers,’ as initially used in the federal regulation in 1975, as still used by federal regulators, and as used in § 641.-285(5)(a)l, Florida Statutes (1985), is a provider of services to an HMO’s members that does not have a contract for the provision of such services.
The court’s interpretation of “unaffiliated providers” is supported by additional evidence. The Department’s chief HMO regulator and two of its examiners when deposed below testified that an unaffiliated provider is a provider without a contract. No Department employee testified to the contrary. See PW Ventures, Inc. v. Nichols, 533 So.2d 281, 283 (Fla.1988) (“contemporaneous” construction by regulating agency is entitled to deference). The Department also published a HMO Consumers’ Guide which advised subscribers that “HMO members must use physicians employed by or under contract with the HMO.... If you want to see a doctor who is not affiliated with the HMO, you will have to pay your own expenses unless referred by an HMO physician.” (e.s.).
Affidavits from various Florida and national experts in the HMO field establish that within the industry the term “affiliated provider” is a provider with a contract and “unaffiliated provider” is a provider without a contract. Jack MacDonald, Senior Vice President of Medical Affairs at Tallahassee Regional Medical Center and former member of the board of directors of Capital Health Plan (a Florida HMO), expressly stated that “[t]he term ‘unaffiliated provider’ does not refer only to providers that are not under common ownership or control of the HMO.” He indicated that whether a provider is “unaffiliated” depends entirely on whether there was a contract and not the method of payment. According to the record, Dennis Threadgill, Chief Attorney for the Department of Insurance, Division of Rehabilitation and Liquidation, explained in a memo and letter in 1987 that “[cjontract providers are those providers who worked for IMC under contracts which have provisions which provide they can look to IMC for payment. They cannot sue the subscriber for payment. Non-contract providers are not limited to looking to IMC for payment. Therefore, it is critical that State Mutual be required to provide payment to the non-contract providers.” Compelling evidence exists to demonstrate that, prior to these lawsuits, substantial agreement existed which identified the term “unaffiliated provider” as a provider without a contract.
Other cases have referred to providers with contracts as “affiliated.” Health Care Plan, Inc. v. Schweiker, 553 F.Supp. 440, 442 (D.N.J.1982), aff'd without opinion, 707 F.2d 1391 (3d Cir.), cert. denied, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); Blue Cross of Rhode Island v. Cannon, 589 F.Supp. 1483, 1486 (D.R.I.1984); Giordano v. Ramirez, 503 So.2d 947, 948 (Fla.3d DCA1987). The term “unaffiliated providers” has commonly been used in the statutes and regulations of other states as meaning providers without contracts. No state statute or regulation uses the term in any other manner. The testimony in the record also establishes that common industry usage of the term is providers without contracts. Even the Department and its supporters have repeatedly used the term in this manner.
The Department and its supporters contend that the purpose of the HMO Act was to strengthen the development of HMOs and to protect providers and encourage them to participate in HMOs. They assert the court’s interpretation will defeat the purpose of the HMO Act and result in the weakening, if not destruction, of the HMO industry. These arguments are not convincing. The insolvency provision at issue here was designed to protect subscribers, not providers. This statutory purpose is demonstrated by (1) the fact that the feder *514 al regulation that requires insolvency coverage is titled “protection of members,” 42 CFR § 110.108(a)(3) (1985); (2) the waiver of 42 CFR § 110.108(a)(3) if the Secretary determines that applicable state law provides that members of the HMO may not be liable for payment of any fees [not just the fees of affiliated providers] which are the legal obligation of the HMOs, 42 CFR § 110.108(3)(ii) (1985); and (3) the provision in section 641.285, Florida Statutes, which allows for insolvency coverage as an alternative to the deposit requirement of section 641.285(1). In Florida, insolvency coverage is only one of several alternatives to meet the requirements of section 641.285, Florida Statutes. See § 641.285, Fla.Stat. Moreover, expert MacDonald testified that an HMO’s ability to attract or retain affiliated providers is not affected by insolvency coverage. HMOs throughout the nation have flourished even where insolvency coverage is required for only non-contract providers. Providers with contracts are, and have been free to negotiate with HMOs as to contractual terms. They are free to reject entirely an HMO’s contract with its attendant benefits.
Construing “unaffiliated provider” as a provider without a contract furthers the goal of protecting the HMO subscribers by providing an incentive for non-contract providers to treat a subscriber whose HMO has become insolvent. Contract providers, unlike non-contract providers, may be required by provisions in their contract to guarantee the continuation of health care services, in the event of insolvency of the HMO, until the end of the contract period for which payment has been made. See § 641.285(5)(a)2, Fla.Stat., supra note 4.
The Department also asserts that the circuit court’s order would render the contract’s coverage for claims of unaffiliated providers meaningless because there is no such thing as a provider without a contract. Clearly, there are providers who have neither an “affiliated provider contract” nor a service contract with the HMO. An implied contract arising between provider and patient when services are rendered is not tantamount to a contract between the provider and the HMO for purposes of insolvency insurance. State Mutual has estimated that IMC’s unaffiliated providers are owed between $6 million and $11 million while Provident Life has already paid hundreds of thousands of dollars to noncon-tract providers in connection with the insolvency of two much smaller HMOs. The distinction between contract and noncon-tract providers has also been applied in federal medicare statutes and other federal statutes and regulations governing HMOs. 42 U.S.C.A. § 300e(b)(3)(A)(iv).
Jess Parrish claims that its board relied on the representations of Sunshine that they were covered by an insolvency endorsement. However, its action (if any) would be against the party making the representations rather than Provident. The same is true of provisions in service contracts for insolvency protection. The HMO breaching the contract, not the rein-surer, would be liable. No evidence produced by the Department or the providers indicates that the reinsurers in these cases ever assumed the risk for contract providers.
Based on the federal and state legislative history of the term “unaffiliated provider” and the evidence and case law supporting the trial court’s interpretation of that term, we affirm the trial court’s orders.
Due to our affirmance of the trial court’s interpretation of the term “unaffiliated provider,” we need not address the Department’s second issue in the State Mutual case regarding the validity of Endorsement Number 3 which defines that term.
AFFIRMED.
MINER and ALLEN, JJ., concur.

. All four cases were heard in a two day consolidated hearing on motions for summary judgment filed in four separate proceedings arising from the collapse of three separate health maintenance organizations (HMOs). Only the three cases involving Provident Life Insurance Company (Provident) were formally consolidated below. The parties filed motions to consolidate the cases on appeal. We previously consolidated these cases for record purposes only and are now consolidating the cases for purposes of this opinion.

. Endorsement No. 3 provides:
This endorsement is hereby made a part of Reinsurance Agreement No. 135 to which it is attached.
It is hereby agreed and understood that Item #3 in the Insolvency Endorsement is deleted and replaced with the following:
3. Provide payment to unaffiliated providers for services rendered both prior to insolvency and after insolvency. An unaffiliated provider is a provider of medical services which are payable pursuant to the Membership Service Agreement, with whom the HMO has no contractual agreement.
This endorsement is effective as of August 1, 1986.
The endorsement was duly signed by an executive vice president of both International Medical Centers, Inc. (IMC) and State Mutual before it finally was submitted to the Department of Insurance.
The trial court made the following pertinent findings:
14. When Mr. Johnson [from the Department] drafted the insolvency endorsement, he sent a copy to the Director of the Division of Compliance in the federal Office of Health Maintenance Organizations in Washington. Mr. Johnson asked the federal official to advise him of any changes that were needed.
15. The federal official requested that State Mutual prepare an endorsement specifically defining the term "unaffiliated providers.” State Mutual drafted a definition, called the federal regulator and obtained approval thereof, incorporated the definition into Endorsement No. 3 to Reinsurance Agreement No. 135, and sent a copy thereof to the federal regulator_ It is uncontested that the federal government requested and approved Endorsement No. 3 and that both State Mutual and IMC — the only parties whose signatures were required — duly signed the endorsement.
16. The Department of Insurance obtained a copy of Endorsement No. 3, marked "CURRENTLY IN-FORCE ON INT. MED. CENTER," by not later than February 5, 1987. The record does not reflect how long the Department had had the endorsement by that time. By that date, the Department had made a detailed analysis of the endorsement’s language, as reflected by a Department official’s handwritten notes on copies of the insolvency endorsement and Endorsement No. 3 itself. The Department also included Endorsement No. 3 in its examination workpapers on IMC. The Department never asserted that Endorsement No. 3 was not in effect and never raised any question whatsoever, to State Mutual or anyone else, concerning the endorsement’s validity.
17.Asked to confirm that the Department never questioned the validity of Endorsement No. 3, Mr. Johnson answered that it was a "signed endorsement” that apparently was “in force” at one time. No contention has been made that anything happened later to terminate the endorsement’s effectiveness.

. On August 5, 1986, Bob Johnson, Chief of the Bureau of Allied Lines, Department of Insurance and Treasurer, sent a memorandum to all Florida HMOs stating:
The attached insolvency amendment is required for all HMOs in the State of Florida using insurance coverage, to meet the insolvency protection requirements of 641.-285(5)(a)l. The endorsement should be added to your policy, verbatim. No changes, additions or deletions will be allowed in this endorsement.
The insolvency endorsement provided:
In consideration of payment of the Insolvency premium, this endorsement is attached to the Reinsurer Contract between _ (hereinafter "Reinsurer”) and _ (hereinafter "HMO”), and is intended to provide a contingency for insolvency with the purview of O.H.M.O. regulation 42 CFR 110.108(A)(1)(IV) and 42 CFR 110.108(A)(3)(B) and Chapter 641.285, Florida Statutes.
It is agreed that in the event of the Insolvency of HMO, the Reinsurer shall:
(1) Continue benefits to covered HMO members for the duration of the contract period for which payment has been made.
*508 (2) Continue benefits to covered. HMO members who are confined on the date of insolvency, or admitted during the coverage period set out in paragraph (1) above in an inpatient facility until their discharge; and
(3) Provide payment to unaffiliated providers for services rendered both prior to insolvency and after insolvency.
42 CFR § 110.108(a)(3) (1975) provides:
Each health maintenance organization shall— (a) Have a fiscally sound operation as demonstrated by a financial plan, satisfactory to the Secretary, which:
(3) Demonstrates an approach to the risk of insolvency which allows for continuation of benefits for the duration of the contract period for which payment has been made, continuation of benefits to members who are confined on the date of insolvency in an inpatient facility until their discharge, and payments to unaffiliated providers for services rendered.
The 1975 provision was subsequently amended and recodified in 42 CFR § 110.108(a)(l)(iv) (1982):
(1) Each HMO shall have a fiscally sound operation as demonstrated by:
(iv) A plan for handling insolvency which allows for continuation of benefits for the duration of the contract period for which payment has been made, continuation of benefits to members who are confined on the date of insolvency in an inpatient facility until their discharge, and payment to unaffiliated providers for services rendered.
The federal regulations were amended again in 1985. The provisions in effect at the time of Mr. Johnson’s memo provided:
§ 110.108(a)(1) Each HMO shall have a fiscally sound operation as demonstrated by:
(iv) A plan for handling insolvency which allows for continuation of benefits for the duration of the contract period for which payment has been made and continuation of benefits to members who are confined on the date of insolvency in an inpatient facility until their discharge.
(3) Protection of members (i) Each HMO shall adopt and maintain arrangements satisfactory to the Secretary to protect its members from incurring liability for payment of any fees which are the legal obligation of the HMO. These arrangements may include:
(A) Contractual arrangements with health care providers used by the members of the HMO prohibiting the providers from holding any member liable for payment of any fees which are the legal obligation of the HMO;
(B) Insurance, acceptable to the Secretary;
(C) Financial reserves, acceptable to the Secretary, that are held for the HMO and restricted for use only in the event of insolvency; or
(D) Any other arrangements acceptable to the Secretary.
Section 641.285, Florida Statutes (1985), provides various methods of insolvency protection an HMO may use to insure the protection of its subscribers. Section 641.285(5)(a) provides:
5(a) The requirements of this section do not apply to an applying or licensed health maintenance organization which has a plan, approved by the department, for handling insolvency which provides for continuation of benefits and payments to unaffiliated providers for services rendered both prior to and after insolvency for the duration of the contract period for which payment has been made, except that benefits to members who are confined on the date of insolvency in an inpatient facility shall be continued until their discharge. This plan shall include at least one of the following:
1. Contracts of insurance or reinsurance on file with the department that will protect subscribers in the event the health maintenance organization is unable to meet its obligations. Each agreement between the organization and an insurer shall be subject to the laws of this state regarding reinsurance. Each agreement and any modification thereto shall be filed with and approved by the department. Each agreement shall remain in full force and in effect until replaced or for at least 90 days following written notification to the department by registered mail of cancellation or termination by either party. The department shall be endorsed on the agreement as an additional insured party.
2. Contractual arrangements with health care providers that include a guarantee by the provider to continue providing health care services to any subscriber of the health maintenance organization, upon insolvency of the organization, until the end of the contract period for which payment by or on behalf of the subscribers has been made or the discharge of the subscriber from an inpatient facility, which occurs later; or
3. Other measures acceptable to the department. (e.s.)

. As HMOs, IMC, Sunshine and Suncoast were regulated by the Department of Insurance' pursuant to Part II, Chapter 641, Florida Statutes, entitled "Health Maintenance Organizations” and by the federal government pursuant to 42 CFR 110.108(a)(3), later renumbered 42 CFR § 110.108(a)(l)(iv).

. The Webster’s Ninth New Collegiate Dictionary 61 (9th ed. 1989) provides the following definitions:
Affiliate ... la: to bring or receive into close connection as a member or branch b: to associate as a member < himself with the local club > 2: to trace the origin of ...
Affiliated: closely associated with another typically in a dependent or subordinate position < the university and its medical school >.
Black’s Law Dictionary 58 (6th ed. 1990) has the following definitions:
Affiliate. Signifies a condition of being united; being in close connection, allied, associated, or attached as a member or branch. Affiliated company. Company effectively controlled by another company. A branch, division, or subsidiary. Under Investment Company Act (15 U.S.C.A. § 80a-2), a company in which there is ownership (direct or indirect) of 5 percent or more of the voting stock.
Corporations which are related as parent and subsidiary, characterized by identity of ownership of capital stock....
Affiliation. Act or condition of being affiliated, allied, or associated with another person, body, or organization. Imports less than membership in an organization, but more than sympathy, and a working alliance to bring to fruitation the proscribed program of a proscribed organization, as distinguished from mere co-operation with a proscribed organization in lawful activities, is essential.... It includes an element of dependability upon which the organization can rely which, though not equivalent to membership duty, rests upon course of conduct that could not be abruptly ended without giving at least reasonable cause for charge of breach of good faith.

. See footnote 4, infra.

. Although the term "affiliate” was used in section 631.011, Florida Statutes (1986), a fraudulent conveyance statute, this statute is not applicable since section 641.201 stated that HMOs are exempt from these other provisions. Although section 641.27(1) provides that the Department shall conduct any liquidation or dissolution of an HMO and "shall have all power with respect thereto granted to it under the laws governing the rehabilitation, liquidation, conservation or dissolution of life insurance companies,” that provision does not render section 641.201 meaningless or make section 631.011 automatically applicable.
The 1989 definition of "affiliate" found in section 641.19(1) is likewise not applicable. The 1989 legislature defined "affiliate" in section 641.19, Florida Statute as:
[A]ny entity which exercises control over or is controlled by the health maintenance organization, directly or indirectly, through;
(a) Equity ownership of voting securities; (b) Common managerial control; or (c) Collusive participation by the management of the health maintenance organization and affiliate in the management of the health maintenance organization or the affiliate.
This definition of "affiliate” was used in a different context than the term “unaffiliated provider" in section 641.285(5)(a) and does not effect the definition of that term. A representative from the Department expressly represented to the Senate Insurance Committee during consideration of the 1989 bill, that the purpose of the provision was to clarify statutory accounting provisions dealing with an HMO’s receivables from "affiliates." The representative stated that the bill would have no effect on any pending litigation. Hearing on Senate Bill 739 Before the Senate Ins. Comm., (April 18, 1989) (statement by Terry Butler of the Department of Insurance). This case was already pending at that time. The bill had nothing to do with insolvency reinsurance or the meaning of the term "unaffiliated provider.” Moreover, the bill was made prospective only. Ch. 89-360, § 74, Laws of Fla.

. The federal government's original position in its complaint in its federal suit, Case No. 87-40271, against State Mutual in Tallahassee was that unaffiliated providers were "those health care providers not under contract with the HMO but who provide emergency services to the HMO enrollees, for services rendered both prior to insolvency and after insolvency.” (Compl. at 3). The complaint, which remains pending, has not been amended. In its "Memorandum of the United States in Support of its Motion for Consolidation,” the federal government stated that under the insolvency endorsement in IMC’s policy, State Mutual is obligated "to reimburse unaffiliated providers who provided medical services to IMC enrolles (sic) on an emergency basis, prior to and after the insolvency." (Mem.Supp.Mot.Consol. at 2). They defined "unaffiliated providers” as "the doctors, pharmacies and hospitals not under contract with IMC who provided emergency health care to IMC enrollees on an emergency basis when enrollees could not be treated by an IMC provider. A typical situation is where an enrollee is on vacation and has a medical emergency.” (Mem.Supp.Mot.Consol. at 2, n. 1). The government published a definition of "unaffiliated providers” in the Federal Register before the instant reinsurance agreement was issued, caused an express definition to be added as an endorsement to the reinsurance agreement, approved that definition, and defined the term again in federal courts after IMC’s collapse, explicitly with respect to IMC. Each time the government’s definition agreed exactly with the circuit court’s ruling now under review.

. The McCarran-Ferguson Act, 15 U.S.C. § 1011 provides in part:
(a) State Regulation. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
(b) Federal Regulation. No act of Congress shall be construed to invalidate, impair or supersede any law enacted by any state for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.